U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

OCT 15 2012

CLERK, U.S. DISTRICT COURT
By _____
          Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

NORMAN LAMKIN,                          §
                                        §
              Petitioner,               §
                                        §
v.                                      §        No. 4:12-CV-442-A
                                        §
RICK THALER, Director,                  §
Texas Department of Criminal            §
Justice, Correctional                   §
Institutions Division,                  §
                                        §
              Respondent.               §

MEMORANDUM OPINION
and
ORDER

This is a petition for writ of habeas corpus pursuant to 28
U.S.C. § 2254 filed by petitioner, Norman Lamkin, a state
prisoner currently incarcerated in the Texas Department of
Criminal Justice, Correctional Institutions Division, in Cuero,
Texas, against Rick Thaler, Director of the Texas Department of
Criminal Justice, Correctional Institutions Division, respondent.
After having considered the pleadings, state court records, and
relief sought by petitioner, the court has concluded that the
petition should be denied.

I.   Factual and Procedural History

In August 2008 petitioner was charged by indictment with
possession of a controlled substance, methadone, in Erath County,

Texas.  (Clerk's R. at 1)  The indictment also included two

sentence-enhancement paragraphs.  (*Id.*)  On January 22, 2009, a

jury found petitioner guilty of the offense and true to the

enhancement allegations and assessed his punishment at 40 years'

confinement.  (Clerk's R. at 28)  In affirming the trial court's

judgment, the state appellate court set out the factual and

procedural background relevant to the case as follows:

> The record shows that appellant was stopped for a
> traffic violation and consented to a search of his car.
> Trooper Vernon Wayne Gaines first searched the area in
> the car between the seat and the center console because
> he had seen appellant taking something out of his
> pocket and secreting it in that location.  There, he
> found a small, clear plastic baggie with white residue
> in it.  Trooper Gaines then searched the glove box
> where he found three wafer pills of methadone in a pill
> bottle and a small, digital pocket scale commonly used
> to weigh drugs.  The scale was covered with a white
> powdery residue.  Lab tests revealed that the baggie
> contained a trace amount of methamphetamine and that
> the residue on the scale contained a trace amount of
> methamphetamine and cocaine.  Appellant was charged
> with possessing the methadone in the pill bottle, not
> the trace amounts of cocaine and methamphetamine found
> in the baggie and on the scale.
>
> The three wafer pills contained methadone and
> weighed 5.14 grams.  The prescription label on the pill
> bottle indicated that the "Methadose" had been
> prescribed for Michelle Nieman.  Nieman was not a
> passenger in the car at the time of the traffic stop.
> According to both appellant and Nieman, the bottle
> belonged to Nieman and had inadvertently been left in
> appellant's car by Nieman a few days before appellant
> was stopped by Trooper Gaines.  While Nieman was in the
> car, the contents of her purse, which included the pill

2

bottle, spilled onto the floorboard.  Nieman explained
that she must have missed the bottle when putting her
stuff back into her purse.  Appellant told Trooper
Gaines that he knew Nieman's pill bottle was in his
car, that she must have forgotten it, and that he was
going to give the bottle back to her.

The trial court held a hearing outside the jury's
presence to determine the admissibility of the
extraneous offenses of appellant's possession of trace
amounts of methamphetamine and cocaine from the baggie
and the scale.  The State argued that, in light of
appellant's excuse for the pill bottle being in his car
and Nieman's support of that explanation, the presence
of other contraband in appellant's car was admissible
to affirmatively link appellant to the methadone.  The
trial court ruled, however, that the extraneous offense
evidence was admissible as "same transaction contextual
evidence" and "res gestae of the finding of the
possession" because it was interconnected with the
commission of the alleged offense.  The trial court
found that the admission of the extraneous offense
evidence was "necessary" for the jury to understand the
charged offense and that it would aid "in establishing
the context of the defendant's action."

*Lamkin v. State*, No. 11-09-057-CR, slip op., 2010 WL 3170647, at

*1-2 (Tex. App.–Eastland Aug. 12, 2010).

The Texas Court of Criminal Appeals refused petitioner's

petition for discretionary review, and the Supreme Court denied

certiorari.  *Lamkin v. State*, PDR No. 1302-10; *Lamkin v. State*,

132 S. Ct. 159 (2011).  Petitioner also filed a state habeas

application challenging his conviction, which the Texas Court of

Criminal Appeals denied without written order.  (State Habeas R.

at cover[1])   This federal petition for habeas relief followed.

## II.   Issues

Petitioner raises five grounds for habeas relief:  (1) he is actually innocent of the offense, (2) the trial court erroneously allowed admission of extraneous offense evidence, (3) the state engaged in prosecutorial misconduct by preventing a key defense witness from testifying, (4) the jury was not instructed on his defensive issues, and (5) he received ineffective assistance of trial counsel.  (Pet. at 6-7)

## III.   Rule 5 Statement

Respondent does not assert that the petition is barred by the statute of limitations, successiveness, or lack of exhaustion. (Resp't Answer at 5)

## IV.   Discussion

### A.   *Legal Standard for Granting Habeas Corpus Relief*

Under 28 U.S.C. § 2254(d), a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless he shows that the prior adjudication:  (1) resulted in a decision

---

[1]"State Habeas R." refers to the state court record in petitioner's relevant state habeas application, No. WR-65,811-05.

4

that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court.  28 U.S.C. § 2254(d).  A decision is contrary to clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court of the United States on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *see also Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  A state court decision will be an unreasonable application of clearly established federal law if it correctly identifies the applicable rule but applies it unreasonably to the facts of the case.  *Williams*, 529 U.S. at 407-08.

Further, federal courts give great deference to a state court's factual findings.  *Hill*, 210 F.3d at 485.  Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct.  This presumption of correctness applies to explicit and implicit findings of fact which are necessary to the state court's

conclusions of mixed law and fact and to the state court's credibility determinations. *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001); *Galvan v. Cockrell,* 293 F.3d 760, 764 (5th Cir. 2002).  The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

When the Texas Court of Criminal Appeals denies relief in a state habeas corpus application without written order, it is a denial on the merits.  *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997).  Under these circumstances, a federal court may assume the state court applied correct standards of federal law to the facts, unless there is evidence that an incorrect standard was applied, and imply fact findings consistent with the state court's disposition.  *Townsend v. Sain*, 372 U.S. 293, 314 (1963)[2]; *Catalan v. Cockrell*, 315 F.3d 491, 493 n.3 (5th Cir. 2002); *Valdez*, 274 F.3d at 948 n.11; *Goodwin v. Johnson*, 132 F.3d 162, 183 (5th Cir. 1997).

### B.  Actual Innocence

In his first ground, petitioner claims he is actually

---

[2]The standards of *Townsend v. Sain* have been incorporated into 28 U.S.C. § 2254(d).  *Harris v. Oliver*, 645 F.2d 327, 330 n.2 (5th Cir. 1981).

innocent of the offense because he was in possession of a valid prescription with authorization from the patient, Michelle Nieman, named on the pharmacy bottle that contained the methadone he was convicted of possessing.   (Pet. at 6)   A stand-alone actual-innocence claim is not cognizable on federal habeas review.  *Herrera v. Collins*, 506 U.S. 390, 417 (1993); *Foster v. Quarterman*, 466 F.3d 359, 367-68 (5th Cir. 2006); *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003).   Thus, petitioner is not entitled to relief under this ground.

### C.  *Extraneous Offense Evidence*

Petitioner claims extraneous offense evidence that he was also found in possession of trace amounts of methamphetamine and cocaine from the baggie and the scale was erroneously admitted over his objection.   (Pet. at 6)

Based solely on state case law and state evidentiary rules, the appellate court addressed the issue as follows:

> First, we must address the question of relevancy. Appellant contends that the extraneous offense evidence was not relevant because the trace amount of contraband recovered would not support a finding that he knowingly possessed that contraband.  We disagree.  The possession of even a trace amount of contraband may support a finding of knowing or intentional possession when other evidence establishes that the defendant knew the substance possessed was contraband.  In this case, the extraneous contraband was visible in the baggie and on the scale, and the baggie was found in the location

7

where the trooper had seen appellant secret something. Under the circumstances in this case, the trial court's determination that the extraneous offense evidence was relevant was within the zone of reasonable disagreement.

Next, we must address the question of whether the extraneous offense evidence was admissible as an exception under Rule 404(b).   Rule 404(b) provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show he acted in conformity therewith but that such evidence may be admissible for other purposes.

We agree with appellant that the evidence was not admissible as same transaction contextual evidence pursuant to *Rogers*.   The court in *Rogers* held that same transaction contextual evidence is admissible as an exception under Rule 404(b) "where such evidence is *necessary* to the jury's understanding of the instant offense."   In discussing such necessity, the court stated, "Only if the facts and circumstances of the instant offense would make little or no sense without also bringing in the same transaction contextual evidence, should the same transaction contextual evidence be admitted."   The *Rogers* court determined that evidence of the defendant's possession of marihuana at the time of his arrest for possession of methamphetamine and burglary was not admissible as same transaction contextual evidence under Rule 404(b).   As in *Rogers,* it would not have been impracticable to avoid describing the recovery of the extraneous drugs; the State could simply have described appellant's arrest for possession of methadone without mentioning the methamphetamine or cocaine.   Trooper Gaines could easily have avoided describing the recovery of the methamphetamine and cocaine found during his consensual search of appellant's car.   Thus, we cannot agree that the extraneous offense evidence was admissible as res gestae of the instant offense or same transaction contextual evidence.

Although we cannot uphold the trial court's ruling

8

for the reasons given by the trial court, we will not
reverse the trial court's ruling if the evidence is
admissible for another reason.  In this case, the
evidence was admissible for the reasons proffered by
the State at trial and on appeal.  The record from the
hearing shows that the State contended that the
extraneous offense evidence was admissible to
"establish affirmative links" between appellant and the
methadone and to refute appellant's defense that his
possession of the pill bottle was merely inadvertent.
The State also makes these assertions on appeal.

To prove unlawful possession of a controlled
substance, the State must prove that the accused
exercised care, custody, control, or management over
the substance and that the accused knew the matter
possessed was contraband.  The evidence must link the
accused to the contraband and establish that the
accused's connection with the drug was more than
fortuitous.   Among the "links" that have been
recognized to establish possession of contraband is
"whether the defendant possessed other contraband or
narcotics when arrested."   The extraneous offense
evidence in this case constituted a recognized link to
drug possession, had relevance apart from its tendency
to prove character conformity, and was, thus,
admissible under Rule 404(b).

Next, we must determine whether the trial court
abused its discretion in performing its Rule 403
balancing test.  Under Rule 403, a trial court must
determine if the probative value of the evidence is
substantially outweighed by the danger of unfair
prejudice.  In making this determination, the trial
court should consider:

(1) how compellingly the extraneous offense
evidence serves to make a fact of consequence
more or less probable—a factor which is
related to the strength of the evidence
presented by the proponent to show the
defendant in fact committed the extraneous offense;

9

(2) the potential the other offense evidence
has to impress the jury "in some irrational
but nevertheless indelible way";

(3) the time the proponent will need to
develop the evidence, during which the jury
will be distracted from consideration of the
indicted offense; and

(4) the force of the proponent's need for
this evidence to prove a fact of consequence,
i.e., does the proponent have other probative
evidence available to him to help establish
this fact, and is this fact related to an
issue in dispute.

Here, the extraneous offense evidence made a fact
of consequence-that appellant knew the pill bottle
contained contraband-more probable.  Appellant's
possession of the baggie containing methamphetamine and
the scale dusted with methamphetamine and cocaine was
necessary to prove scienter, an essential element of
the State's case that could not be inferred from his
knowing possession of a pill bottle that belonged to
somebody else.  Appellant's statement to Trooper Gaines
proved only that appellant knew Nieman's pill bottle
was in his car, not that he knew it contained
contraband.  The extraneous offense evidence had little
potential to impress the jury in an irrational way.
Since all of the contraband was discovered during the
same search of appellant's car, little extra time was
spent by the State to develop evidence of the
extraneous offenses.  Finally, the State's need for the
extraneous offense evidence was great; the State needed
to link appellant to the knowing possession of the
methadone in the pill bottle by showing that appellant
knowingly possessed other contraband at the time of his
arrest.  Accordingly, we cannot hold that the danger of
*unfair* prejudice substantially outweighed the probative
value of the extraneous offenses.

*Lamkin*, 2010 WL 3170647, at *2-4 (citations omitted).

The Texas Court of Criminal Appeals refused petitioner's petition for discretionary review without written order, which constitutes a denial of the claim on the merits and is entitled to the appropriate deference, absent clear and convincing evidence in rebuttal.  Petitioner has failed to establish that the state courts' adjudication of the issue is contrary to, or involves an unreasonable application of, clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.  *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991). It is beyond the scope of federal habeas review to review the correctness of the state court's interpretation of state law. *Young v. Dretke,* 356 F.3d 616, 628 (5th Cir. 2004); *Creel v. Johnson,* 162 F.3d 385, 395 (5th Cir. 1998); *Weeks v. Scott,* 55 F.3d 1059, 1063 (5th Cir. 1995).

Furthermore, a federal habeas court will disturb state court evidentiary rulings on habeas review only if they render the trial fundamentally unfair.  *Payne v. Tennessee*, 501 U.S. 808,

825 (1991); *Pemberton v. Collins,* 991 F.2d 1218, 1226 (5th Cir.

1993); *Scott v. Maggio,* 695 F.2d 916, 922 (5th Cir. 1983).

Petitioner has failed to make the requisite showing that the

evidence rendered his entire trial fundamentally unfair or that

but for the admission of the evidence the result of his trial

would have been different.   *Brecht v. Abrahamsom,* 507 U.S. 619,

637 (1993).

### D.   Prosecutorial Misconduct

Petitioner claims the state prevented a key defense witness,

Delsie Darnell, from testifying with threats, and "spoliation" of

the squad car video recording prevented him from access to

potentially exculpatory evidence.   (Pet. at 7)

In support of the first claim, petitioner presented the

affidavit of Darnell, who was a passenger in the car when

petitioner was stopped.   Darnell was incarcerated on an unrelated

drug offense at the time of petitioner's trial.   In her

affidavit, she testified as follows:

> I met Norman Lamkin on June 7, 2007 when he
> paroled to my mom's house in Brownwood, Texas.   Norman
> had been to prison behind drugs.   Norman was very
> adamant about not repeating that mistake.   Norman
> stayed away from drugs and alcohol at all cost.   Norman
> found and started a job as an auto mechanic on his
> second day in Brownwood.   Norman always went to work
> and did everything required of him by parole.   Norman
> made it very clear to me and my friends that he had no

desire for alcohol or drugs.  Norman was not involved
in alcohol or drugs.  Norman took a drug test every
month at his parole meetings and he always passed them.
Norman always went to 12 step meetings with other sober
people.  I attended some of these meetings with him at
Winner's Circle and Narcotics Anonymous in Brownwood.
Norman also always attended church with me and my mom
and my two little girls.  I had no reasons to ever
doubt Norman or his sobriety.

On January 10, 2008, I was a passenger in Norman's
Geo (car) when Norman was stopped by a DPS state
trooper for speeding.  The car Norman was driving was a
standard shift transmission with the shifter in the
console area of the car.  As Norman was pulling over to
the side of the road his right hand operated the manual
shifter in the console area of the car.  Once the car
had stopped Norman reached for the park brake lever in
the console area of the car and pulled the park brake
lever up into the locked position that applies the park
brakes so the car doesn't roll or move.  Norman then
reached into his back pocket and pulled out his wallet,
removed his driver's license, and set his wallet down
on the console area between his seat and my seat.  Then
the state trooper walked up to the window on the
driver's side of the car and asked Norman to step out
of the car with his license and proof of insurance.
Norman was only wearing a t-shirt and jeans.  It was
very cold outside.  Norman asked the trooper if he
could grab his jacket from the backseat of his car but
the trooper told Norman, "No," and instructed Norman to
step to the back of Norman's vehicle.  Norman was
standing in between his car and the patrol car out in
the cold on the side of the highway for around 20
minutes or so while the trooper sat in his car.

I saw Norman shivering out in the cold weather.  I
thought that this was rather cruel treatment by the
trooper, especially since Norman had a jacket in his
car but the trooper refused to let him have it.  This
caused me to fear the trooper's actions.

After about 20 minutes the trooper came to the

13

passenger side of the car, opened my car door and
instructed me to get out of the car. The trooper then
began to search Norman's car. After the trooper
finished searching Norman's car the trooper placed a
small prescription bottle on top of the car and asked
Norman who Michelle Nieman was and why her prescription
bottle was in the glove box of Norman's car. Norman
told the trooper that Michelle Nieman was his co-
worker, she left the bottle in his car by accident, and
told the trooper that he could call Michelle Nieman on
his cell phone and verify that she had left her
prescription bottle in Norman's car. The trooper then
pulled a small clear plastic baggie out of his front
pocket and asked Norman, "Who does this belong to?"
Norman replied, "That did not come out of my car. I
have never seen that before." At no time did I see the
trooper remove any clear baggie from Norman's car. The
first time I ever saw any baggie is when the trooper
removed the baggie from his front shirt pocket. I had
been with Norman all that day. At no time did I ever
see Norman involved in any drug activity. Norman was
very coherent and very sober that day. The only
substance Norman had consumed that day was coffee. At
no time did I ever see Norman possess or hide any type
of small clear plastic baggie. Norman was not on any
drugs. Norman never attempted to hide anything from
the trooper. Norman was very cooperative with the
trooper even though the trooper had been down right
rude and mean toward both of us.

The trooper arrested Norman and instructed me to
sit on the side of the highway all alone by myself at
night. I was 45 miles away from my home in Brownwood,
Texas. The trooper told me that I could not drive
Norman's car, that I had to call someone to come and
get me. The trooper left with Norman in handcuffs. I
was left on the side of the highway at night all alone
in the middle of no where.

The actions of the trooper were heartless and
caused me extreme fear and anxiety over my safety as I
mentally re-lived past assaults and rapes all while
sitting on the side of the highway that night for hours

waiting on someone to drive all the way out from
Brownwood to come and get me off the side of the
highway.

Six months later in June of 2008, I was arrested
on an unrelated drug charge in Brownwood, Texas.  This
had nothing to do with Norman as Norman had been in
jail for several months awaiting trial on the above
incident, when I was arrested in June of 2008.  In June
of 2008 I pled guilty to drug possession and was
sentenced to probation with the condition that I
complete a SAFP drug treatment program.  In October of
2008 I was sent to the Halbert Unit of TDCJ for the
drug treatment program.  I had been corresponding with
Norman since my arrest.  Norman wrote to me about the
false allegations in the trooper's report of the
trooper alleging that Norman was hiding stuff in his
car, was high on drugs, and that he had cocaine and
methamphetamine in his car.  I knew that these
allegations were false and for that reason I told
Norman that I wanted to testify at his trial as to the
truth of matters regarding his arrest because I was
there as a passenger in his car when he was arrested.

In December of 2008 Norman wrote to me and
informed me that I would be bench warranted to
Stephenville to testify at his trial in January, 2009.
I was willingly and expectedly awaiting to be bench
warranted from the Halbert Unit drug treatment facility
to Stephenville for the purpose of testifying as a
defense witness at Norman's trial.  Subsequently, I was
called into a meeting at the Halbert Unit with a woman
who I believed was a drug treatment counselor at the
Halbert Unit.  I had not ever seen her before.  She was
dressed in regular clothing like the counselors at the
Halbert Unit wear.  She identified herself originally
only as Marque Mooney.  She began asking me a lot of
questions about my charge and Norman and what Norman is
to me, and the incident of Norman's arrest.  I freely
answered her questions believing that she was a drug
treatment counselor.  She asked me if I intended to
testify at Norman's trial.  I told her, "Yes."  I asked
her how she knew so much about Norman's case.  At that

15

point she then identified herself to me as an
investigator for the Stephenville District Attorney's
office and told me that if I testified on Norman's
behalf at his trial then my probation would be revoked,
I would be charged with the same possession as Norman
was facing and that I would serve a minimum of five
years in prison before I ever even saw parole.  She
then asked me if Norman was worth a minimum of five
years of my life in prison away from my little girls
and mom.  This caused me to be very upset because I
believed her when she told me that I would go to prison
if I testified at Norman's trial.  I wanted to testify
at Norman's trial.  I wrote Norman and told him what
had happened with Ms. Mooney threatening to send me to
prison if I testify.  All this happened within a few
weeks before Norman's trial.  Norman wrote me back and
said that he had the bench warrant request removed
because he didn't want the District Attorney's office
coming after me if I testify at his trial.  I was not
bench warranted and I did not get to testify at
Norman's trial.

    Because of the threats made upon me by Ms. Mooney
over the consequences of my testimony as a defense
witness for Norman I did not testify at Norman's trial,
despite my desire to testify at Norman's trial.  I
later discovered, after Norman's trial, that Ms. Mooney
had lied to me.  I was advised that my June of 2008
probation could not have been revoked over a pre-
probation incident that occurred in January of 2008,
and I could not have been charged with possessing the
prescription bottle that was found in the glove box of
Norman's car because I was only a passenger in Norman's
car and I could not have been charged with any other
substance alleged to have been found in Norman's car
either.

    I was willing and able to testify to all of the
above.  Ms. Mooney, acting as the Stephenville District
Attorney's investigator, inhibited and prevented me
from testifying at Norman's trial as a defense witness.
Ms. Mooney filled me with lies and misrepresentations
of law, and threatened me with probation revocation and

16

> criminal charges and promised me a minimum of five
> years in prison if I testified on Norman's behalf at
> his trial over the above incident.  I now offer my
> statement and willingness to testify as to all of the
> above matters.
>
> I was not ever contacted by Norman's trial
> attorney.[3]

(State Habeas R. at 16-18)

In response, Mooney submitted an affidavit testifying in

relevant part as follows:

> I served as an investigator with the Erath County
> District Attorney's Office from 1995 until 2009.
> During this time, I was a certified Texas Peace
> Officer.  As part of my duties as the District Attorney
> Investigator, on or about December 17, 2008, I
> interviewed Delsie Darnelle[4] at the Ellen Halbert
> Substance Abuse Felony Punishment Facility in Burnet,
> Texas, where Darnelle was incarcerated on an unrelated
> matter.
>
> The purpose of this interview was to discover what, if
> anything, Darnelle knew of a Possession of a Controlled
> Substance offense alleged to have been committed by
> Norman Eugene Lamkin on or about January 10, 2008, in
> Erath County, Texas.  Trial was scheduled in that case
> on January 21, 2009.  Darnelle had been subpoenaed to
> testify in the case by the defense.  As Darnelle had
> not been previously interviewed by a State agent, this
> was necessary for proper case preparation.
>
> I met with Darnelle in the SAFP administration
> building.  I advised her who I was, identifying myself
> as a peace officer.  As she was a witness, and not a

---

[3]This sentence was handwritten on the face of the affidavit.

[4]This spelling of Darnell's last name was in the original.

17

suspect in the Lamkin matter, I did not advise her of her *Miranda* rights. Darnelle agreed to speak with me.

I first spoke with Darnelle about her background. I learned that she had four children and had married Norman Lamkin in May, 2008. Darnelle also reported that her brother had been assessed a sixty-year prison sentence for a narcotics offense. In speaking with Darnelle, I formed the opinion that she was overly stressed and emotionally unstable.

I then questioned Darnelle regarding what she knew of Lamkin's case. I asked if she had been in the vehicle with Lamkin when he was arrested. Darnelle replied that she was. I asked Darnelle if the 'dope' found in the vehicle was hers. Darnelle first said that it was, but then said it might have been Michelle Nieman's, because Lamkin was dating both of them at the same time. I felt that Darnelle was being dishonest about the matter, particularly due to her flawed logic in not knowing whether she or Michelle Nieman possessed the controlled substance. Darnelle was adamant in saying that Lamkin was not using drugs at the time of his arrest, and had helped her with her own drug problems.

As I was doubtful of Darnelle's claim that the 'dope' was really hers, I asked her if she was willing to take a 'rap' for Lamkin. Darnelle replied that since Lamkin was a habitual offender, he was risking ninety-nine years if he was convicted; but that if she were to do the time for him, it would only be a state jail felony for which she would 'only have to do five years.' I then asked Darnelle if Lamkin was worth her losing another five years of not being in her children's lives. Darnelle then began to cry and asked to speak with her attorney. I then terminated the interview.

I have read the affidavit of Delsie Darnell dated February 25, 2011. In that affidavit, Darnelle states that she believed that I was a drug counselor. In my meeting with Darnelle, I never suggested to Darnelle that I was a drug counselor, or allowed her to have that impression. I clearly identified myself at the

beginning of the interview as a peace officer,
specifically a District Attorney's Investigator.

In Darnelle's affidavit, she states that I told her
that if she testified for Lamkin, her probation would
be revoked, that she would be charged with possession
the same as Lamkin, and that she would serve a minimum
of five years in prison before she ever saw parole.
Darnelle presents this version of events as a threat on
my part.  In actuality, I told Darnelle that if she
were to testify under oath that that [sic] she
possessed a controlled substance, that her testimony
could be used to charge her with the offense.  I
further advised Darnelle that if she were to lie in her
sworn court testimony, she could be charged with
Aggravated Perjury.  I also advised her that conviction
on either of those offenses could have consequences
regarding any parole or probation matters in the
future.  I never expressed any of these ideas a
certainty, but rather as things that Darnelle needed to
think about in deciding what she intended to testify
to.  I made these points to Darnelle specifically
because her version of events were [sic] not logical
and strained credibility.  My purpose was solely to get
at the truth.

Finally, in Darnelle's affidavit, she accuses the
arresting officer in the Lamkin case of planting
evidence and other improper actions, including the
intentional destruction of the video recording of the
stop.  At no time in my interview with her did Darnelle
suggest or imply that the arresting officer had done
anything illegal or improper during the traffic stop
leading to Lamkin's arrest, or at any other time.

(*Id.* at 102-03)

Petitioner's counsel also testified, via affidavit, on this

issue as follows:

In the affidavit signed by Delsie Ann Darnell, she
contends that she could have provided exculpatory

19

testimony for Mr. Lamkin were she asked to appear.  The
clerk's record contains a request filed for Mr. Lamkin
by me requesting issuance of a bench warrant for Ms.
Darnell, who was incarcerated outside of Erath County
at the time of Mr. Lamkin's pretrial and trial.  The
trial court granted the bench warrant on January 5,
2009, prior to the January 20, 2009 trial date.
Abruptly following issuance of the bench warrant, Mr.
Lamkin instructed me to immediately withdraw his
application for a bench warrant for Ms. Darnell.  I
inquired as to why Mr. Lamkin wished to immediately
withdraw the bench warrant.  He explained to me that he
had received correspondence from Ms. Darnell that the
investigator for the District Attorney's office had
visited her to inquire about the nature of her
testimony were she to appear at Mr. Lamkin's trial.
Mr. Lamkin expressed to me concern over what Ms.
Darnell might offer as testimony, and explained to me
that Ms. Darnell might provide testimony that would be
detrimental to his defense.  I explained that I needed
the bench warrant executed so that I might at least
visit with her at the Erath County Jail to determine
what her testimony would be at trial.  He adamantly
insisted that I withdraw the bench warrant
immediately–he did not want his "wife" to testify in
his trial.  Accordingly, I requested the trial court
withdraw the bench warrant, which is noted in the trial
court's docket sheet entry for January 15, 2009.

(State Habeas R. at 98-99)

The state habeas judge, who also presided at petitioner's

trial, having considered petitioner's state habeas application,

the state's response, and the affidavits, found the application

to be "without legal or factual merit" and recommended the

application be denied without hearing, and the Texas Court of

Criminal Appeals followed this recommendation.  (*Id.* at 104)

20

This court is bound by the state courts' factual findings, both implicit and explicit. Weighing the credibility of the affiants was the role of the state habeas court. *Pippin v. Dretke,* 434 F.3d 782, 792 (5th Cir. 2005). The state court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are "virtually unreviewable" by the federal courts. *Id.* Clearly, the habeas court, having considered the affidavits and the likely credibility of the affiants upon the probable reliability of their affidavits, believed Mooney's version of the events.

Furthermore, complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what a witness would have testified to are largely speculative. *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002); *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001). Petitioner presents no compelling argument or evidence to rebut the state courts' adjudication of this claim.

Petitioner's spoilation claim is procedurally barred. Petitioner raised the claim in a pretrial hearing and again in his state habeas application. (RR, vol. 5, at 20-26; State

Habeas R. at 19)   Petitioner did not, however, raise the claim on direct appeal.   Under state law, claims that could have been raised on direct appeal but were not are barred from habeas review.   *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996).   Although this rule was not explicitly relied upon by the state courts, the rule is strictly and regularly applied, and the Fifth Circuit has held that the rule is an independent and adequate state ground precluding federal habeas review.   *Aguilar v. Dretke*, 428 F.3d 526, 535 (5th Cir. 2005).

Although a federal court may consider a procedurally defaulted claim if "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice[,]" petitioner makes no attempt to satisfy these requirements.   As a result, this claim is procedurally barred.[5]

### E.   *Jury Instruction and Ineffective Assistance of Counsel*

---

[5]Even if the this court were to consider the claim, it fails.   Petitioner has made no showing that law enforcement or the state, in bad faith, intentionally destroyed or lost the video recording as would be required under a federal analysis. *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988).   Nor has he shown that the video recording was exculpatory and was withheld under *Brady*.   *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

Petitioner claims that the jury should have been instructed on the defensive issue of lawful possession with a valid prescription[6] under the "law of agency" because he had authorization from Nieman to keep the Methadone in his possession until it could be returned to her and that his trial counsel was ineffective by not requesting such an instruction.   (Pet. at 7)

A criminal defendant has a constitutional right to the effective assistance of counsel at trial.   U.S. CONST. amend. VI, XIV; *Strickland v. Washington*, 466 U.S. 668, 688 (1984).   To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different.   *Strickland*, 466 U.S. at 688.   Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance.   *Id.* at 687, 697.

In applying this standard, a court must indulge a strong presumption that counsel's conduct fell within the wide range of

_____

[6]Texas Penal Code § 481.115 provides that "a person commits an offense if the person knowingly or intentionally possesses a controlled substance listed in Penalty Group 1, unless the person obtained the substance directly from or under a valid prescription . . . .   TEX. PEN. CODE ANN. § 481.115(a) (Vernon 2010).

reasonable professional assistance or sound trial strategy. *Id.*
at 668, 688-89. Furthermore, petitioner's complaints largely
involve matters of trial strategy. Federal habeas courts are not
to lightly second-guess counsel's decisions on matters of tactics
and generally entrust such matters to the professional discretion
of counsel. Indeed, "[s]trategic choices made after thorough
investigation of law and facts relevant to plausible options are
virtually unchallengeable." *Id.* at 690.

Counsel responded to this issue as follows:

Mr. Lamkin contends that his counsel did not request
jury instructions on defensive issues. The jury
instructions and questions presented by the Court
included a standard legal definition of the term
"possession" utilized by Texas courts in controlled
substance cases. Mr. Lamkin contends in his Writ that
the defensive theory that he possessed the substance
under a valid prescription through alleged permission
of the prescription holder, Ms. Nieman, was not
appropriately or adequately addressed in the jury
charge.

Through testimony presented by the defense, the jury
heard that the Methadose in Mr. Lamkin's glovebox was
in Mr. Lamkin's possession because it was unwittingly
left in his car by Ms. Nieman. Under cross-
examination, Ms. Nieman acknowledged that a number of
days passed between when she left the Methadose in Mr.
Lamkin's car, and that several days passed after Mr.
Lamkin discovered the Methadose in his car, before Mr.
Lamkin was arrested with the Methadose still in his
possession. In jury argument, I presented to the jury
the defense position that the Methadose was left in Mr.
Lamkin's car by Ms. Nieman, and upon Mr. Lamkin's
discovery of the Methadose, he innocently kept the

24

Methadose in his glove box intending to return it
unused to Ms. Nieman at their earliest meeting.

In my view, the jury charge definition of "Possession"
was sufficient to put before the jury the question of
whether Mr. Lamkin knowingly obtained or received the
Methadose or was aware of his control of the Methadose
for a sufficient time to permit him to terminate his
control.   The definition was as follows:

> "Possession" means actual care, custody,
> control or management.   Possession is a
> voluntary act if the possessor knowingly
> obtains or receives the thing possessed or is
> aware of his control of the thing for a
> sufficient time to permit him to terminate
> his control.

In my professional judgment, as a matter of trial
tactic and strategic argument, it would have stretched
the logic of the defense position to contend that, on
one hand, the presence of the Methadose in Mr. Lamkin's
car was accidental, while then seeking a jury charge
that asked the jury to consider whether Ms. Nieman
entrusted the Methadose to Mr. Lamkin so that he could
purposely deliver the Methadose to her.   I believed,
based on the evidence presented, the better trial
tactic was to argue to the jury that Mr. Lamkin did not
knowingly obtain the Methadose, and that, upon its
discovery, Mr. Lamkin intended and sought to terminate
his control as soon as practicable.   The only safe,
prudent means of terminating his control of the
Methadose was to return it to Ms. Nieman at the
earliest date he encountered Ms. Nieman.

Unfortunately, the jury, having knowledge of scales and
bags with narcotic residue found in the same glove box
where the Methadose was kept, did not render a verdict
indicating belief of the defensive theory.

(State Habeas R. at 99-100)

Counsel's explanation about his decision not to request a

jury instruction under the law of agency was not unreasonable, given that such an instruction potentially conflicted with the defensive strategy.  Furthermore, Nieman testified that she did not realize she left the bottle of Methadose in petitioner's car and that petitioner did not call her about the bottle until after his arrest.  (RR, vol. 7, at 196-200)  This testimony mitigates against any argument that an agency relationship should make petitioner's possession lawful.

For the reasons discussed herein,

The court ORDERS the petition of petitioner for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby, denied.

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Court, and 28 U.S.C. § 2253(c), for the reasons discussed herein, the court further ORDERS that a certificate of appealability be, and is hereby, denied, as petitioner has not made a substantial showing of the denial of a

constitutional right.

SIGNED October _____, 2012.


JOHN MCBRYDE
UNITED STATES DISTRICT JUDGE